**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion C. Passmore (SBN 228474)
  passmore@bespc.com
515 South Flower Street, Suite 1800
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BEGICH, Derivatively and On Behalf of COMPASS DIVERSIFIED HOLDINGS, COMPASS GROUP DIVERSIFIED HOLDINGS LLC, and COMPASS GROUP MANAGEMENT LLC, | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ELIAS J. SABO, RYAN J. FAULKINGHAM, STEPHEN KELLER, PATRICK A. MACIARIELLO, LARRY L. ENTERLINE, ALEXANDER S. BHATHAL, JAMES J. BOTTIGLIERI, GORDON M. BURNS, HAROLD S. EDWARDS, HEIDI LOCKE SIMON, NANCY B. MAHON, and TERI R. SHAFFER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| COMPASS DIVERSIFIED | |

---
1
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

HOLDINGS, COMPASS GROUP DIVERSIFIED HOLDINGS LLC, and COMPASS GROUP MANAGEMENT LLC,

Nominal Defendants.

Plaintiff Mark Begich ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by the Company to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Company; (iii) a consolidated securities class action lawsuit filed in this Court captioned *In re: Compass Securities Litigation*, Case No. 8:25-cv-0981-MRK-KES (the "Securities Class Action"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning the Company.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff, on behalf of nominal defendants Compass Diversified Holdings, Compass Group Diversified Holdings LLC ("Compass LLC"), and Compass Group Management LLC ("CGM") (collectively, "Compass" or the "Company"), against certain current and former members of the Company's Board of Directors (the "Board"). This derivative action arises from breaches of their fiduciary duties of loyalty, candor, and good faith and other violations of law, in connection with the Individual Defendants causing, approving, and/or acquiescing in the Company's issuance of false and misleading

statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects between March 1, 2023 and May 7, 2025 ("Relevant Period").

2.      Compass is a private equity firm specializing in add-on acquisitions, buyouts, industry consolidation, recapitalization, late stage, and middle market investments. The Company seeks to invest in leading industrial or branded consumer companies, textiles, apparel and luxury goods, trading companies and distributors, manufacturing, distribution, consumer discretionary, commercial services and supplies, consumer products, capital goods, leisure products, consumer service, consumer staples, household durables, business services sector, infrastructure healthcare, safety and security, electronic components, food, and foodservice.

3.      Lugano Diamonds & Jewelry, Inc. ("Lugano"), is a leading designer, manufacturer, and marketer of high-end, one-of-a-kind jewelry. Lugano conducts sales via its own retail salons as well as pop-up showrooms at Lugano-hosted or sponsored events in partnership with influential organizations in the equestrian, art and philanthropic community. The Company purchased a controlling interest in Lugano on September 3, 2021, for approximately $263.3 million.

4.      Throughout the Relevant Period, the Individual Defendants failed to disclose that: (i) Compass's internal control over financial reporting was defective; (ii) Lugano had violated applicable accounting rules and acceptable industry practices with respect to its financing, accounting, and inventory practices during the Company's 2022, 2023, and 2024 fiscal years; (iii) Lugano's 2022, 2023, and 2024 financial results had been artificially distorted by these irregularities; (iv) Compass had failed to implement effective internal controls over the Company's financial reporting; and (v) as a result, Compass's reported 2022, 2023, and 2024 financial results were materially misstated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.     The truth was revealed on May 7, 2025, when the Company issued a press release titled, "Compass Diversified Discloses Non-Reliance on Financial Statements for Fiscal 2024 Amid an Ongoing Internal Investigation into its Subsidiary, Lugano Holding, Inc." The press release revealed that Compass "preliminarily identified irregularities in Lugano's non-CODI financing, accounting, and inventory practices."

6.     The Company further announced in the May 7, 2025 press release that following discussions with senior leadership and investigators, the Audit Committee of the Board concluded that "previously issued financial statements for 2024 require restatement and should no longer be relied upon." The Company also announced its intention to delay the filing of its first-quarter 2025 Form 10-Q.

7.     The fallout extended to Lugano's founder and chief executive, Moti Ferder, who resigned from all positions on May 7, 2025, and did not receive severance. His wife and co-founder, Idit Ferder, also exited the company.

8.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Compass has sustained damages as described below.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Actions are pending in this District.

## **PARTIES**

14.     Plaintiff is a stockholder of Compass, was a stockholder of Compass at the time of the wrongdoing alleged herein and has been a stockholder of the Company continuously since October 2016.

15.     Nominal Defendant Compass Diversified Holdings is a publicly traded Delaware statutory trust, the purpose of which is to hold 100% of the limited liability interests of Nominal Defendant Compass LLC.

16.     Nominal Defendant Compass LLC is a holding company used to house the various operating companies that form the business of Compass. Compass LLC oversees the management and business of the Company, and the performance of CGM.

17.     Nominal Defendant CGM is the manager for Compass. Compass pays management fees to CGM, which includes the compensation paid to Compass's executive management, all of whom are employees of CGM. Pursuant to the Management Services Agreement applicable in 2024, Compass paid CGM a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

quarterly management fee equal to 0.5% (2% annually) of its consolidated adjusted net assets.

18.　　Defendant Elias J. Sabo ("Sabo") has served as Chief Executive Officer ("CEO") and as a director of Compass since May 2018. Defendant Sabo is one of the founding partners of Nominal Defendant CGM, is a managing member of CGM, and is named as a defendant in the Securities Class Action.

19.　　Defendant Ryan J. Faulkingham ("Faulkingham") served as the Chief Financial Officer ("CFO") during the Relevant Period until he departed from the Company, effective August 31, 2024. Defendant Faulkingham was also an employee of Nominal Defendant CGM and is named as a defendant in the Securities Class Action.

20.　　Defendant Stephen Keller ("Keller") has served as the CFO since August 31, 2004, when he replaced Defendant Faulkingham.  Defendant Keller is named as a defendant in the Securities Class Actions.

21.　　Defendant Patrick A. Maciariello ("Maciariello") has served as Chief Operating Officer ("COO") of Compass since May 2005. Defendant Maciariello is also an employee of Nominal Defendant CGM and is named as a defendant in the Securities Class Actions.

22.　　Defendant Larry L. Enterline ("Enterline") has served as Chair of the Board since July 2022 and as a director of the Company since July 2019.

23.　　Defendant Alexander S. Bhathal ("Bhathal") has served as a director of the Company since January 2022.

24.　　Defendant James J. Bottiglieri ("Bottiglieri") has served as a director of the Company since December 2005.

25.　　Defendant Gordon M. Burns ("Burns") served as a director of the Company from May 2008 until June 7, 2025.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26.     Defendant Harold S. Edwards ("Edwards") has served as a director of the Company since April 2006.

27.     Defendant Heidi Locke Simon ("Simon") has served as a director of the Company since July 2023.

28.     Defendant Nancy B. Mahon ("Mahon") has served as a director of the Company since May 2023.

29.     Defendant Teri R. Shaffer ("Shaffer") has served as a director of the Company since July 2022.

30.     Defendants Sabo, Faulkingham, Keller, Maciariello, Enterline, Bhathal, Bottiglieri, Burns, Edwards, Simon, Mahon, and Shaffer are collectively referred to herein as the "Individual Defendants."

**<u>DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

33.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Compass were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.    ensure that the Company was operated in a diligent and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

34.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in

the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.    In addition, the Company has also adopted a Code of Ethics (the "Code"). The Code states in pertinent part:

> I. Covered Persons/Purpose. This code of ethics (the "Code") applies to the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions (collectively, the "Covered Officers" each of whom is set forth on Exhibit A attached hereto), directors, officers, and employees of Compass Group Diversified Holdings LLC (the "Company") as well as all officers and employees of Compass Group Management LLC (the "Manager") involved in the oversight of the day-to-day operations of the Company and its subsidiaries (together, with the Covered Officers, the "Covered Persons") for the purpose of promoting: A) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; B) full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company and its subsidiaries; C) compliance with applicable governmental laws, rules and regulations; D) the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; E) avoidance of conflicts of interest, including disclosure to an appropriate person or persons identified in the Code of any material transaction or relationship that reasonably could be expected to give rise to such a conflict; F) accountability for adherence to the Code; and G) an enforcement mechanism for compliance with the Code. Each Covered Person shall adhere to a high standard of business ethics and shall be sensitive to situations that may give rise to actual, as well as apparent, conflicts of interest.

*                *                *

III. Compliance with Laws. All actions taken by the Company and the Covered Persons, without exception and wherever they may be acting, must be in compliance with the laws, rules and regulations (including insider trading laws) applicable to the Company and its subsidiaries. Covered Persons are expected to comply with the laws of the country in which they operate as well as United States' laws and the Company's policies governing its business activities. These laws and policies include, without limitation, compliance with the U.S. Foreign Corrupt Practices Act, competition laws and anti-money laundering laws. Anyone aware of any violation by any Covered Person, whether based on actual fact or reasonable grounds for suspicion, of any applicable law, rule or regulation, or of any provision of this Code, must immediately make a written report to the Company's Nominating and Corporate Governance Committee (the "NCG Committee").

*                *                *

V. Corporate Opportunities/Duty of Loyalty. Covered Persons owe a duty to the Company to advance its legitimate interests to the best of their abilities. Covered Persons are prohibited from: A) diverting any business opportunities from the Company or any of its subsidiaries for his or her own benefit or taking for themselves personally opportunities that are properly within the scope of the Company or such subsidiary's activities pursuant to the Company's or such subsidiary's internal procedures or requirements relating to review and consideration of such opportunities; and B) using Company property, information or position for personal gain, financial or otherwise.

*                *                *

VII. Disclosure & Compliance Each Covered Person shall: A) be familiar with the disclosure requirements generally applicable to the Company and its subsidiaries under applicable laws, including the federal securities laws and the rules and regulations promulgated thereunder; B) not knowingly misrepresent, or cause others to misrepresent, facts about the Company and its subsidiaries to others, whether within or outside the Company and its subsidiaries, including to the Company's directors and auditors, and to governmental regulators and self-regulatory organizations; C) to the extent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

appropriate within his or her area of responsibility, consult with other officers and employees of the Company and its subsidiaries with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Company files with, or furnishes to, the SEC and in other public communications made by the Company; and D) promote compliance with the standards and restrictions imposed by any applicable laws, rules and regulations.

36.     In addition, the Board's Audit Committee members during the Relevant Period, Defendants Bottiglieri, Edwards, Shaffer, and Simon (referred to herein as the "Audit Committee Defendants") had enhanced duties and responsibilities. Per the Audit Committee Charter:

The primary purpose of the Committee is to assist the Board in fulfilling its oversight responsibility relating to the integrity of the Company's and its subsidiaries' financial statements, the accounting and financial reporting processes and the financial statement audits.

37.     To that end, the responsibilities of the Audit Committee Defendants as laid out in the Audit Committee Charter include:

***Financial Statements and Disclosure Matters***

1) Audit Report. The Committee shall review the Company's financial statements and discuss with the independent auditors: (a) any matters of concern arising in connection with audits of such financial statements, including any adjustments to such statements recommended by the independent auditors or any other results of the audits; (b) any significant changes in the Company's selection or application of accounting principles; (c) any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and (d) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

2) Annual Financial Information. The Committee shall: (a) review and discuss with management and the independent auditors the annual audited financial statements, the form of the audit opinion to be issued

by the auditors on the financial statements, and disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K and in the Earnings Release; (b) recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K; and (c) prepare the report to shareholders required to be included in the Company's annual proxy statement under Item 407(d)(3)(i) of Regulation S-K.

3) Quarterly Financial Information. The Committee shall (a) review and discuss with management and the independent auditors the Company's quarterly unaudited financial statements and reports from the independent auditors relating to: (i) all critical accounting policies and practices to be used; (ii) alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditors; and (iii) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences, including disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, in each case, prior to the filing of the Company's Quarterly Reports on Form 10-Q; and (b) recommend to the Board whether such financial statements should be included in the Company's Quarterly Report on Form 10-Q.

4) Earnings Announcements. The Committee shall review and discuss with management and the Company's independent auditors the Company's earnings press releases, prior to public release, including, the types of information to be included and the presentation thereof and the use of any pro- forma, adjusted or other non-GAAP financial information, and any financial or non-financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and the type of presentation to be made.

5) Internal Controls, CEO, CFO Certifications. The Committee shall:

(a) review with the Company's Chief Executive Officer, Chief Financial Officer, management, the internal auditors or other personnel responsible for the internal audit function, and the independent auditors,

the adequacy and effectiveness of the Company's and its subsidiaries' financial reporting processes, internal controls over financial reporting and disclosure controls and procedures, including any significant deficiencies and material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls, procedures, or service providers (such as the Manager or accountants) and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls or procedures;

(b) discuss with management and the Company's independent auditors changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's control over financial reporting; and

(c) review and discuss with management and the Company's independent auditors disclosures relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications made by the Company's Chief Executive Officer and Chief Financial Officer, or persons performing similar roles, to be included in or attached as exhibits to the Company's Annual Report on Form 10-K or Quarterly Report(s) on Form 10-Q, as applicable.

6) Other Communications with Auditors. The Committee shall review and discuss with the Company's independent auditors any other matters required to be discussed by PCAOB Auditing Standards No. 1301, Communications with Audit Committees, and all other applicable requirements of the PCAOB and the SEC.

7) Critical Accounting Policies. The Committee shall: (a) consider and review, as appropriate and in consultation with the independent auditors, the appropriateness and adequacy of the Company's critical financial and accounting policies, internal controls over financial reporting and, as appropriate, the internal controls of key service providers; (b) review management's responses to the independent auditors' comments relating to the foregoing policies, procedures and controls; and (c) take any necessary action in light of any material control deficiencies.

***Compliance Oversight***

1) Complaints and Concerns. The Committee shall have responsibility for the establishment and oversight of processes and procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls over financial reporting or auditing matters, and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, in each case, in accordance with the guidelines set forth in Annex B.

2) Ethics. The Committee shall assist the Board in establishing and monitoring compliance with the ethical business practice standards of the Company and review with management (including counsel) and the Director of Internal Audit, the results of their review of compliance with applicable laws, regulations, listing standards, and the Company's Code of Ethics.

3) Violations. The Committee shall be designated as and serve as the Qualified Legal Compliance Committee for the Company in accordance with the provisions of Section 307 of the Sarbanes-Oxley Act of 2002. Upon receipt of a report of evidence of a material legal violation, the Committee will notify the Board of such report, investigate and recommend appropriate measures to the Board. If the Company does not appropriately respond, the Committee may take further appropriate action, including notification to the SEC.

4) Legal Compliance. The Committee shall consult, on an ongoing basis, with management, the independent auditors and counsel as to legal or regulatory matters affecting its responsibilities, as well as relevant tax, accounting and industry developments. The Committee shall review with management or any external counsel as the Committee considers appropriate, any legal matters (including the status of pending litigation) that may have a material impact on the Company and any material reports or inquiries from regulatory or governmental agencies. The Committee shall review with management the adequacy and effectiveness of the Company's procedures to ensure compliance with its legal and regulatory responsibilities.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5) Risk Oversight. The Committee shall discuss with management, the independent auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements, accounting policies or internal control over financial reporting.

\*        \*        \*

***Oversight of Company's Internal Audit Function***

1) Internal Audit. The internal auditor or internal audit service provider, as the case may be, shall report periodically to the Committee regarding any significant deficiencies in the design or operation of the Company's and its subsidiaries' internal control over financial reporting, material weaknesses in the internal control over financial reporting and any fraud (regardless of materiality) involving persons having a significant role in the internal control over financial reporting, as well as any significant changes in internal control over financial reporting implemented by management during the most recent reporting period of the Company.

2) Risk Oversight. The Committee shall discuss with management, the internal auditor or internal audit service provider, as the case may be, and the independent auditor, the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

3) Internal Audit Service Providers. With respect to outsourcing internal audit services, the Committee shall engage, evaluate and terminate internal audit service providers and approve fees to be paid to such internal audit service providers.

1

## SUBSTANTIVE ALLEGATIONS

2

**Company Background**

3      38.     Compass is a holding company and trust created for the purpose of

4   acquiring and managing a group of small and middle-market businesses

5   headquartered in North America. According to its SEC filings, Compass "acquire[s]

6   controlling interests in and actively manage[s] businesses that we believe (i) operate

7   in industries with long-term macroeconomic growth opportunities, (ii) have positive

8   and stable cash flows, (iii) face minimal threats of technological or competitive

9   obsolescence, and (iv) have strong management teams largely in place. We offer

10   investors a unique opportunity to own a diverse group of leading middle-market

11   businesses in the branded-consumer, industrial and healthcare and critical

12   outsourced services sectors."

13      39.     On September 3, 2021, the Company purchased a controlling interest in

14   Lugano for approximately $263.3 million. Lugano is a leading designer,

15   manufacturer and marketer of high-end, one-of-a-kind jewelry. Lugano's high-end

16   jewelry includes unique rings, necklaces, earrings, bracelets, and brooches that range

17   in price from under $1,000 to well over seven figures, with an average price of

18   approximately $450,000 per retail transaction in 2024.

19      40.     The acquisition of Lugano substantially increased the management fees

20   Compass paid to CGM. For example, the fees paid to CGM in 2022 (the first full

21   year after the acquisition) was roughly $63 million, compared to approximately $35

22   million in 2020.

23      41.     Beginning in 2024, Lugano began purchasing inventory from a vendor

24   who is a related party to Lugano through one of the executive officers of Lugano.

25   Per the Company's Form 10-K filed with the SEC on February 27, 2024 (the "2024

26   10-K") for the year ended December 31, 2024, the Company saw "notable increases

27   in net revenue at . . . Lugano ($162.3 million increase) . . . ." This accounted for over

28

21% of the Company's total net sales and approximately double the proportion of Company sales attributable to Lugano just two years previously.

42.    For 2024, Lugano accounted for over 57% of Compass's total operating income, making Lugano the most profitable among all of the Company's businesses. Lugano's strong sales contributed to the Company paying management fees of $74,767,000 to Defendant CGM for 2024.

**The Individual Defendants Cause the Company to Issue**
**Materially False and Misleading Statements During the Relevant Period**

43.    On March 1, 2023, the Company filed with the SEC its annual report on Form 10-K for its fourth quarter and full year 2022 ("2022 10-K"), signed by Defendants Sabo, Faulkingham, Edwards, Burns, Bottiglieri, Enterline, Bhathal, and Shaffer. The 2022 10-K claimed that "there have not been any changes in the Company's internal control over financial reporting . . . during our fourth fiscal quarter to which this Annual Report on Form 10-K relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

44.    Attached to the 2022 10-K were certifications signed by Defendants Sabo and Faulkingham pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), which attested to the accuracy and truthfulness of the statements contained within the 2022 10-K.

45.    The 2022 10-K also claimed, among other things, that Lugano's "[n]et sales for the year ended December 31, 2022 increased approximately $76.4 million or 61.1%, to $201.5 million, compared to the corresponding year ended December 31, 2021."

46.    During the associated earnings call on March 1, 2023, a securities analyst asked whether the Company "is [] still going to be heavily invested in

[Lugano's inventory] because the return on the growth at Lugano [has been significant.]" In response, Defendant Sabo claimed that the Company would continue to see significant returns on its investment in Lugano's inventory. Sabo stated, in relevant part:

> The answer is yes. I would tell you, and I mentioned this earlier, we have planned for a much more conservative growth plan with Lugano, and that has embedded in the overall guidance of the company. They're currently running dramatically ahead of where our growth plan would be . . . That requires us to invest capital.

> What we've seen and what we experienced over the course of our ownership is that if we invest $1 in inventory, that yields about an additional dollar of revenue. And that's sort of an incremental 40% margin, right, EBITDA margin. And as long as that trend continues, and we're able to get a 40% pretax return on invested capital on that inventory, we're going to continue to do it because we can't find opportunities like that very often to deploy our capital into.

> So the question will -- and what we look at on, frankly, a weekly and monthly basis is, are inventory investments continuing to yield the sales growth and are the relationships remaining consistent? And so far they are and they have over the course of our ownership. So we will continue to invest in the growth of Lugano . . . .

47.   On May 3, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for its first quarter 2023 ("1Q23 10-Q"). The 1Q23 10-Q claimed that "there have been no material changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

48.    Attached to the 1Q23 10-Q were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 1Q23 10-Q.

49.    The 1Q23 10-Q also claimed, among other things, that Lugano's "[n]et sales for the quarter ended March 31, 2023 increased approximately $16.9 million, or 35.9%, to $63.9 million, compared to the corresponding quarter ended March 31, 2022."

50.    During the associated earnings call on May 3, 2023, Defendant Sabo touted Lugano's significant and continued growth rates due to Compass prioritizing its investment in Lugano's inventory. Defendant Sabo stated, in relevant part:

> So when you think about capital allocation, I would say #1 priority within our firm is to fund the kind of high-return opportunities within our portfolio, and Lugano clearly kind of goes to the top of that list. You see that as we've been building inventory in the company, we've been generating and generated plus 30% growth rates in that company. I think there's a lot of runway to continue to invest there and have very high return on invested capital.

51.    On August 2, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for its second quarter 2023 ("2Q23 10-Q"). The 2Q23 10-Q claimed that "there have been no material changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

52.    Attached to the 2Q23 10-Q were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 2Q23 10-Q.

53.     The 2Q23 10-Q also claimed that "[n]et sales for the quarter ended June 30, 2023 increased approximately $21.9 million, or 56.0%, to $60.9 million, compared to the corresponding quarter ended June 30, 2022."

54.     During the associated earnings call on August 2, 2023, Defendant Sabo touted Lugano's accelerating growth and attributed it to Compass's investment in Lugano. Defendant Sabo stated in relevant part:

A lot of the limitations on the growth of this business was really predicated on investment, how much capital was available to put new salons in place? How much capital was available for inventory to create these pieces?

And so when we partnered with Moti to kind of drive this business forward, we were able to solve a lot of those capital issues. And what you've seen is an acceleration in the company's growth because of that. We don't view this as temporary, and we don't view the kind of growth opportunity as being limited right now. And in fact, we're seeing some of the programs that we're putting in place and some of the additional tie-ins that we have around our customer segment, it's only accelerating and strengthening kind of the community effect and the purchase of kind of product ultimately and profitability of this business.

55.     On November 2, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for its third quarter 2023 ("3Q23 10-Q"). The 3Q23 10-Q claimed that "there have been no material changes in Compass's internal control over financial reporting . . . during the Company's most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, Compass's internal control over financial reporting."

56.     Attached to the 3Q23 10-Q were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 3Q23 10-Q.

57.    The 3Q23 10-Q also stated, among other things, that Lugano's "net sales for the quarter ended September 30, 2023 increased approximately $27.6 million, or 53.9%, to $78.7 million, compared to the corresponding quarter ended September 30, 2022." The 3Q23 10-Q further stated that Lugano had "experienced strong same store sales growth as it has invested in building out its inventory as well as its sales, marketing and event staff . . . ."

58.    During the associated earnings call on November 2, 2023, Defendant Sabo boasted of Lugano's growth rate during the quarter. Defendant Sabo stated, in relevant part:

> [I]f [Lugano] continues with growth rates, which frankly are just torrid at this point, look, it could get to the point where its sheer size starts to kind of exceed what our diversification sort of efforts would look like. The company is going to continue at these growth rates.

59.    Defendant Faulkingham also touted Lugano's success which "enabled" the Company's "strong year-to-date growth rate." Defendant Faulkingham stated, in relevant part:

> Year-to-date, Lugano has consumed $139 million in working capital to fund its inventory growth, which has generated exceptional return on invested capital and enabled the strong year-to-date growth rate we have experienced. We expect to continue to monetize working capital across the business in Q4 with the exception of Lugano as we continue to fund its growth objectives.

60.    On February 28, 2024, Compass filed with the SEC its annual report on Form 10-K for its fourth quarter and full year 2023 ("2023 10-K") signed by Defendants Sabo, Faulkingham, Edwards, Burns, Bottiglieri, Enterline, Mahon, Bhathal, Simon, and Shaffer. The 2023 10-K claimed that

"There have not been any changes in the Company's internal control over financial reporting . . . during Compass's fourth fiscal quarter to which this Annual Report on Form 10-K relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

61.    Attached to the 2023 10-K were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 2023 10-K.

62.    The 2023 10-K also claimed, among other things, that Lugano's "net sales for the year ended December 31, 2023 increased approximately $106.8 million or 53.0%, to $308.3 million, compared to the corresponding year ended December 31, 2022." The 2023 10-K attributed this increase in net sales to "an increase in sales from its existing locations as it has invested in building out its inventory as well as its sales . . . ."

63.    During the associated earnings call on February 28, 2024, Defendants Sabo and Faulkingham boasted of Compass's continuance of giving Lugano "capital investment" as the main reason for Lugano's "remarkable" growth rate. Defendant Sabo stated, in relevant part:

> Lugano once again delivered remarkable growth producing 53% annual revenue growth and 65% adjusted EBITDA growth.
>
> As we have repeatedly mentioned, Lugano has created a very innovative and disruptive business model within the high jewelry industry. We continue to fund capital investment to expand the company's footprint and inventory position, realizing exceptionally strong returns on invested capital that is fueling the company's rapid growth.

64.    On the call Defendant Faulkingham elaborated on the success and status of Lugano, stating in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In addition, we prefunded Lugano with significant inventory early in the first quarter of 2024 in preparation for the London salon opening, which is planned in the second quarter, and thus, we anticipate our leverage will increase during the first and second quarter, then decline sequentially in the third and fourth quarter as a result of strong growth we expect in our subsidiary adjusted EBITDA.

*   *   *

During 2023, Lugano invested $157 million in inventory to fund its growth. This inventory investment has generated an exceptional return on invested capital and enabled the strong growth Lugano has experienced.

65. On May 1, 2024, Compass issued a press release reporting its financial results for its first fiscal quarter ended March 31, 2024. According to the press release, during the quarter, Compass's net sales increased 8% year-over-year to over $524 million and its adjusted earnings increased 73% year-over-year to more than $34 million. The press release stated that these favorable results were "driven by a 61% increase in Lugano net sales" to over $103 million during the quarter and adjusted quarterly EBITDA at Lugano of approximately $42 million. The press release also quoted Defendant Sabo as stating that "Lugano had a "great first quarter[]" and "[g]iven our first quarter results and the momentum we see in many of our businesses, we are feeling optimistic and raising our outlook."

66. Also on May 1, 2024, Compass filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter of 2024 ("1Q24 10-Q"). The 1Q24 10-Q contained the same financial information regarding Compass and Lugano's first quarter as provided in the press release. The 1Q24 10-Q stated that there had "been no material changes in [Compass's] internal control over financial reporting" during the quarter.

67.    Attached to the 1Q24 10-Q were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 1Q24 10-Q.

68.    During the associated earnings call the same day, a securities analyst asked Defendant Maciariello why the Company's "confidence level is so high" that Lugano would continue to see the "large growth rate" it had displayed for the last several quarters. In response, Defendant Maciariello attributed the continued "large growth rate" to Compass's significant investment in Lugano's inventory. Defendant Maciariello stated, in relevant part:

> Compass [is] investing significantly in inventory as you can see and as we told you. And we're more and more getting the right pieces in the right places at the right time to be sold.

69.    On July 31, 2024, Compass issued a press release reporting its financial results for its second quarter. According to the press release, during the quarter, Compass's net sales increased 11% year-over-year to approximately $543 million and its adjusted earnings increased 36% year-over-year to nearly $40 million. The release stated that these favorable results were due to "continued strong sales growth at Lugano," which had grown to over $99 million during the quarter, and adjusted quarterly EBITDA at Lugano of approximately $36 million.

70.    Also on July 31, 2024, Compass filed with the SEC a quarterly report on Form 10-Q for second quarter 2024 ("2Q24 10-Q"). The 2Q24 10-Q stated that there had "been no material changes in Compass's internal control over financial reporting" during the quarter.

71.    Attached to the 2Q24 10-Q were certifications signed by Defendants Sabo and Faulkingham pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 2Q24 10-Q.

72.    During the associated earnings call on the same day, a securities analyst asked Defendant Sabo whether there was any "rule of thumb around inventory investment translating" to sales. In response, Defendant Sabo provided a general rule, but revealed his surprise about Lugano's accelerating growth rate. Defendant Sabo stated in relevant part:

> Yes, Matt, it's basically remained similar to where it's been. I would say we do have some additional investment we're making upfront. As our growth rate is actually accelerating, which is really remarkable given how fast this business has been growing. But as it's accelerating, it actually requires a little bit more upfront capital, especially as we're expanding our footprint. And for example, going to London, now being international, it creates some challenges about moving inventory that kind of required a little bit more investment.

> So in general, I would say the numbers are sticking exactly where they have been historically. And as we look at the business, I mean, part of the question that Pat said on your -- or answer Pat did for your question on modeling, I mean, the level of inventory investment also is a kind of component to modeling out how large and fast this business will grow. We've said this for 3 years, and I know it's hard for everybody and for us, too, to accept a little bit that as we put in more inventory, there is kind of demand within our network. And as we're growing that network of buyers for, there's additional demand that is there. And so we are creating more revenue opportunity with inventory investment.

> I think that continues and that has not slowed down. And so as we look into 2025, other than a desire to be a little bit more conservative and not get out over our skis, I would say there's nothing present right now that says this business should have a material change in sort of kind of its performance and growth outlook, it's going to be the kind of same thing. It's getting the people onboarded, getting kind of the product and the inventory built, those are sort of some of the constraints right now that we have to grow. It feels like demand still is solidly more within our network than what we're currently satisfying.

73. On October 30, 2024, Compass issued a press release reporting its financial results for the third quarter 2024. According to the press release, during the quarter Compass's net sales increased 12% year-over-year to approximately $583 million and its adjusted earnings increased 65% year-over-year to nearly $49 million. The press release stated that these favorable results were due to "continued strong sales growth at Lugano," which had grown to approximately $119 million during the quarter, and adjusted quarterly EBITDA at Lugano of approximately $51 million.

74. Also on October 30, 2024, Compass filed with the SEC a quarterly report on Form 10-Q for its third quarter 2024 ("3Q24 10-Q"). The 3Q24 10-Q stated that there had "been no material changes in Compass's internal control over financial reporting" during the quarter.

75. Attached to the 3Q24 10-Q were certifications signed by Defendants Sabo and Keller pursuant to SOX, which attested to the accuracy and truthfulness of the statements contained within the 3Q24 10-Q.

76. During the associated earnings call on the same day, a securities analyst asked Defendant Maciariello to identify the "key drivers of growth" of Lugano's growth. In response, Maciariello stated, among other things, Compass's investment in Lugano's inventory. Specifically, Maciariello stated, in relevant part:

> So I'm only going to say that all salons did increase year-over-year. I'm not going to kind of touch on kind of salon by salon or area by area where the growth was. But the organic salons -- or the existing salons continue to grow and perform really well.
>
> We do continue to see a march up in sort of our average transaction value which is driving a decent chunk of growth. We also see an increase in our number of transactions per quarter. So it's a little of each, if that makes sense. And I'm sorry I can't be more in-depth than that. But it's a little of each.

And really, it goes to -- we believe Lugano fundamentally has a different business model, and we believe it's disruptive. I mean we are offering more value to the consumers than are any of Lugano's competitors. And we believe that that's important whether you're dealing with -- whether you're dealing with people of any demographic, right? And so that's important for people of the highest demographic as well.

We're creating long-term relationships and we're really allowing them to look at jewelry as more of a store of wealth. So we think it's a combination of all those things, right? And clearly, you see our investments in inventory. You need to have diamonds in order to sell diamonds, right? And that's part of what we're doing as well. And we're getting turns on that, and we're getting a very good return on our investment . . .

\*    \*    \*

[A]s we grow and as we get more scale and as we add more capabilities and more talent in management, we're clearly buying at least as effectively, if not more effectively, number one.

77.    On February 27, 2025, Compass filed with the SEC the 2024 10-K, signed by Defendants Sabo, Keller, Edwards, Burns, Bottiglieri, Enterline, Mahon, Bhathal, Simon, and Shaffer. The 2024 10-K stated that there had "not been any changes in the Company's internal control over financial reporting" during the fourth quarter.

78.    The 2024 10-K was signed by Defendants Keller and Sabo, and both filed SOX certifications attesting to the report's accuracy and completeness and that the report was free from fraud and the product of effective internal controls over financial reporting.

79.    Also on February 27, 2025, Compass issued a press release reporting its financial results for its fourth fiscal quarter and year ended December 31, 2024. According to the press release, during the fourth quarter Compass's net sales

increased 14% year-over-year to more than $620 million and its adjusted earnings increased 29% year-over-year to over $118 million. The press release stated that these favorable results were due to "continued strong sales growth at Lugano," which had grown to nearly $150 million during the quarter, and adjusted quarterly EBITDA at Lugano of approximately $66 million.

80.     During the associated earnings call on the same day, Defendant Maciariello touted Lugano's continued "exceptional results" and attributed them to, among other things, Lugano's "disruptive business model."

81.     The above statements identified in ¶¶ 43-80 were materially false and/or misleading and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) Compass's internal controls over financial reporting were defective; (ii) Lugano had violated applicable accounting rules and acceptable industry practices with respect to its financing, accounting, and inventory practices during the Company's 2022, 2023, and 2024 fiscal years; (iii) Lugano's 2022, 2023, and 2024 financial results had been artificially distorted by these irregularities; (iv) Compass had failed to implement effective internal controls over the Company's financial reporting; and (v) as a result, Compass's reported 2022, 2023, and 2024 financial results did not reflect the actual financial results of the Company and such reported results were materially misstated.

**The Board Issues False and Misleading Proxies**

82.     On April 12, 2023, Defendants Sabo, Edwards, Burns, Bottiglieri, Enterline, Bhathal, Mahon, and Shaffer caused the Company to file an annual proxy statement with the SEC ("2023 Proxy"). In the 2023 Proxy, the Board sought shareholder approval for, *inter alia*: (1) the re-election of Defendants Edwards, Mahon, Burns, Bottiglieri, Enterline, Bhathal, and Shaffer as directors; and (2) the

ratification of the appointment of Grant Thornton LLP ("Grant Thornton") as the Company's Independent Registered Public Accounting Firm for 2023.

83.     Regarding the Board's role in risk oversight the 2023 Proxy stated:

The Company's Board has overall responsibility for risk oversight. In furtherance of this responsibility, during 2022, the Board added a director with risk oversight, and specifically, cybersecurity experience. The Company's general counsel presents, and the Board assesses, at least annually, the critical legal and regulatory risks associated with the businesses of the Company and each of its subsidiaries, the overall risk environment for the Company's business, as well as the steps taken by the appropriate management team, if any, to mitigate any such risks. The Board also performs a significant portion of its role in risk oversight through the audit committee. The audit committee charter provides that the audit committee shall assist the Board in fulfilling its oversight responsibility relating to the evaluation of enterprise risk issues. In addition, the audit committee, pursuant to its charter, discusses with management, counsel, the vice president of internal audit and internal audit service providers, as the case may be, and the independent auditors, the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies. The Company's internal audit department supervises the day-to-day risk management responsibilities of the Company through its internal audit review processes which are performed at the Company level, as well as at each Company subsidiary. The internal audit department tailors its review to provide enhanced evaluations in specific areas which have included, without limitation, fraud, cybersecurity, adequacy of insurance, gift and entertainment and other spending, and business continuity. Our internal audit team reports directly to the audit committee, which is comprised solely of independent directors. In addition, during each quarterly meeting of the audit committee, the members of the audit committee meet with the Company's vice president of internal audit and independent auditors, in each case, without management present, to discuss the specific areas of risk identified during the quarter, if any. The audit committee is authorized to utilize outside lawyers, internal staff,

independent experts, and other consultants to assist and advise the committee in connection with its responsibilities, including the evaluation of the Company's major risk exposures. The Company's management team, including Company counsel, regularly evaluates the risks inherent to the businesses of the Company's subsidiaries and reports the results of such evaluations to the full Board for consideration at least annually and more frequently if the particular facts and circumstances dictate. The Board also oversees ESG matters generally as part of its oversight of our business strategy and risk management, and the Board's standing committees each oversee specific ESG matters that fall within their respective areas of responsibility. For example, the audit committee has oversight responsibility of compliance with the organization's periodic reporting and disclosure obligations and the nominating and corporate governance committee has responsibility for overseeing the organization's policies with respect to corporate social responsibility and global corporate citizenship, as well as ensuring that the Company maintains strong governance practices. The Board and its standing committees regularly discuss with management a variety of ESG topics that are significant to our business and stakeholders. The Board believes that the foregoing processes for overseeing risk ensures that independent directors are aware of the Company's major risk exposures.

84.    The 2023 Proxy stated the following regarding the Company's Audit Committee:

The audit committee is comprised entirely of independent directors who meet the independence requirements of the NYSE and Rule 10A-3 of the Exchange Act and includes two "audit committee financial experts," although only one such expert is required by applicable SEC regulations. Our audit committee, which has been established in accordance with Section 3(a)(58)(A) of the Exchange Act, is responsible for, among other things:

- retaining and overseeing our independent accountants;

- assisting the Board in its oversight of the integrity of our financial statements, the qualifications, independence and performance of our independent auditors and our compliance with legal and regulatory requirements;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- reviewing and approving the plan and scope of our internal and external audit;

- pre-approving any audit and non-audit services provided by our independent auditors;

- approving the fees to be paid to our independent auditors;

- reviewing with our chief executive officer, chief financial officer and independent auditors the adequacy and effectiveness of our internal controls;

- reviewing and approving the calculation of the profit allocation payments, if any, to be made to the Allocation Member;

- preparing the audit committee report to be filed with the SEC;

- reviewing hedging transactions; and

- reviewing and assessing annually the audit committee's performance and the adequacy of its charter.

85.     The above statements ¶¶ 83-84 conveyed that the Board and its committees maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in the Company's financial reporting yet was unaware of existing material risks that could and would affect the Company. The above statements also gave assurances that the auditor was being properly overseen and audit disclosures were accurate.

86.     The 2023 Proxy omitted any disclosures regarding the adverse facts specified herein. The 2023 Proxy failed to disclose, *inter alia*, that: (i) Compass's internal control over financial reporting was defective; (ii) Lugano had violated applicable accounting rules and acceptable industry practices with respect to its financing, accounting, and inventory practices during this time; (iii) Lugano's financial results at this time had been artificially distorted by these irregularities; (iv)

31

Compass had failed to implement effective internal controls over the Company's financial reporting; and (v) as a result, Compass's reported financial results at this time did not reflect the actual financial results of the Company and such reported results were materially misstated.

87.    The 2023 Proxy harmed Compass by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting Compass. As a result of the false or misleading statements in the 2023 Proxy, Compass stockholders voted to re-elect Defendants Edwards, Mahon, Burns, Bottiglieri, Enterline, Bhathal, and Shaffer as directors and Grant Thornton as the independent auditor for 2023.

88.    On April 10, 2024, Defendants Sabo, Edwards, Burns, Bottiglieri, Enterline, Bhathal, Mahon, Simon, and Shaffer caused the Company to file an annual proxy statement with the SEC ("2024 Proxy"). In the 2024 Proxy, the Board sought shareholder approval for, *inter alia*: (1) the re-election of Defendants Edwards, Mahon, Simon, Burns, Bottiglieri, Enterline, Bhathal, and Shaffer as directors; and (2) the ratification of the appointment of Grant Thornton as the Company's Independent Registered Public Accounting Firm for 2024.

89.    Regarding the Board's role in risk oversight, the 2024 Proxy stated:

> Our Board recognizes the importance of effective risk oversight to the organization's continued success and in fulfilling its fiduciary responsibilities to the Company and its shareholders. The members of the Company's senior leadership team, including our Chief Executive Officer, Co-Chief Compliance Officers, General Counsel, Chief Financial Officer, Senior Vice President of Internal Audit, and the Chief Operating Officer and Vice President and Director of ESG of our Manager, are responsible for the day-to-day management of risk, and the regular reporting to the Board or the appropriate committee, regarding the Company's major risk exposures (such as strategic and competitive risks, financial risks, brand and reputation risks, cybersecurity and technology risks, legal and compliance risks,

regulatory risks, ESG risks, and operational risks) and the steps management has taken to monitor and control such exposures. Our Board is responsible for promoting an appropriate culture of risk management throughout the organization, overseeing our aggregate risk profile and monitoring how the Company addresses specific risks. In furtherance of this responsibility, the Board has continually added directors with general risk oversight experience, and specific expertise in areas such as cybersecurity, sustainability and global corporate citizenship.

Our General Counsel updates the Board regularly on material legal and regulatory matters and presents, and the Board assesses, at least annually, the critical legal and regulatory risks associated with the business of the Company and each of its subsidiaries, the overall risk environment for the Company's business, as well as the steps taken by the appropriate management team, if any, to mitigate such risks. The Board also performs a significant portion of its role in risk oversight through the Audit Committee. The Audit Committee charter provides that the Audit Committee shall assist the Board in fulfilling its oversight responsibility relating to the evaluation of enterprise risk issues and regularly discuss with management, counsel, the internal audit leadership and internal audit service providers, as the case may be, and the independent auditors, the Company's major risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies. The Company's internal audit department reinforces the day-to-day risk management responsibilities of the Company's senior leadership team through its internal audit review processes which are performed at the Company level, as well as at each Company subsidiary. The internal audit department tailors its review to provide enhanced evaluations, on a rotating basis, in specific areas which have included, without limitation, fraud, cybersecurity, adequacy of insurance, gift and entertainment and other spending, offsite satellite office controls, and business continuity. Our internal audit team reports directly to the Audit Committee, which is comprised solely of independent directors. In addition, during each quarterly meeting of our Audit Committee, the members of the Audit Committee meet with the Company's Senior Vice President of Internal Audit, independent auditors and counsel, in each case,

without management present, to discuss the specific areas of risk identified during the quarter, if any.

The Audit Committee is authorized to utilize outside lawyers, internal staff, independent experts, and other consultants to assist and advise the committee in connection with its responsibilities, including the evaluation of the Company's major risk exposures. The Company's Co-Chief Compliance Officers regularly, and no less than quarterly, brief the Audit Committee, who in turn reports to the full Board on matters of ethics and compliance.

90.    The 2024 Proxy stated the following regarding the Company's Audit Committee:

The Audit Committee is comprised entirely of independent directors who meet the independence requirements of the NYSE and Rule 10A-3 of the Exchange Act. Ms. Shaffer, Mr. Bottiglieri and Mr. Edwards served on our Audit Committee for all of fiscal year 2023 and Ms. Locke Simon joined the Audit Committee on July 5, 2023. All of the foregoing individuals continue to serve on our Audit Committee. Mr. Bottiglieri served as chair of our Audit Committee until April 1, 2023, at which point Ms. Shaffer took over the role. Ms. Shaffer continues to serve as chair of our Audit Committee. The Board has determined that three of the four members of the Audit Committee, Ms. Shaffer, Mr. Bottiglieri, and Ms. Locke Simon, qualify as "*audit committee financial experts*" as defined under applicable SEC rules. The Audit Committee met seven times during 2023. All Audit Committee members attended over 90% of the Audit Committee's meetings during 2023.

Our Audit Committee, which has been established in accordance with Section 3(a)(58)(A) of the Exchange Act, is responsible for, among other things:

- overseeing the Company's financial reporting and disclosure process, including oversight of management and independent auditors in the production of the Company's financial

statements, as well as all controls and procedures relating thereto;

- selecting, engaging and approving the fees charged or proposed to be charged by the Company's independent auditors;

- pre-approving any audit and non-audit services to be performed by the Company's independent auditors;

- evaluating the qualifications, performance and independence of the Company's independent auditors;

- reviewing the Company's quarterly and annual audited financial statements and reports from internal and external auditors and recommending to the Board whether such financial statements should be included in the periodic reports filed with the SEC;

- reviewing with the Company's Chief Executive Officer, Chief Financial Officer and personnel responsible for the internal audit function and independent auditors the adequacy and effectiveness of the Company's internal controls over financial reporting;
- reviewing and discussing with the Company's independent auditors any matters required to be discussed by the Public Company Auditing Oversight Board and other applicable requirements of the SEC;

- consulting with the independent auditors, as appropriate regarding the Company's critical financial and accounting policies;

- overseeing the processes and procedures for the receipt, retention and treatment of submissions received by the Company regarding accounting, internal accounting controls over financial reporting or auditing matters;

- assisting the Board in establishing and monitoring compliance with the ethical business practice standards of the Company;

- consulting, on an ongoing basis, with management, independent auditors and counsel as to legal or regulatory matters, as well as relevant tax, accounting and industry developments;

- reviewing and discussing with management cybersecurity threats and developments and the Company's cybersecurity risk, programs, policies, practices, and risk mitigation strategies;

- overseeing the Company's internal audit function;

- discussing with management, internal audit personnel and the Company's independent auditors the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures;

- reviewing and approving derivative transactions, if any, to be entered into by the Company;

- reviewing and approving the calculation of any profit distribution payment due to the holders of the Allocation Interests in the Company;

- reviewing and discussing with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for and disclosures of its significant related person transactions;
- preparing the Audit Committee report to shareholders required to be included in the Company's annual proxy statement; and

- reviewing and assessing annually the Audit Committee's performance and the adequacy of its charter.

91. The above statements in ¶¶ 89-90 conveyed that the Board and its committees maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in the Company's financial reporting yet was unaware of existing material risks that could and would affect the Company.

The above statements also gave assurances that the auditor was being properly overseen and audit disclosures were accurate.

92.    The 2024 Proxy omitted any disclosures regarding the adverse facts specified herein. The 2024 Proxy failed to disclose, *inter alia*, that: (i) Compass's internal control over financial reporting was defective; (ii) Lugano had violated applicable accounting rules and acceptable industry practices with respect to its financing, accounting, and inventory practices during this time; (iii) Lugano's financial results at this time had been artificially distorted by these irregularities; (iv) Compass had failed to implement effective internal controls over the Company's financial reporting; and (v) as a result, Compass's reported financial results at this time did not reflect the actual financial results of the Company and such reported results were materially misstated.

93.    The 2024 Proxy harmed Compass by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting Compass. As a result of the false or misleading statements in the 2024 Proxy, Compass stockholders voted to re-elect Defendants Edwards, Mahon, Simon, Burns, Bottiglieri, Enterline, Bhathal, and Shaffer as directors and Grant Thornton as the independent auditor for 2024.

**The Truth Emerges**

94.    The truth was revealed on May 7, 2025, when the Company filed a Form 8-K with the SEC which stated, in pertinent part:

> In April 2025, the Audit Committee of Board of Directors (the "Audit Committee") of Compass Group Diversified Holdings LLC ("CODI," or the "Company") commenced an internal investigation into the financing, accounting, and inventory practices of Lugano Holding, Inc. ("Lugano"), a subsidiary and operating segment of the Company, based on concerns reported to Company management as to these practices. Upon being notified of the concerns, Company management

immediately informed the Audit Committee, and the Audit Committee promptly retained outside legal counsel to assist in conducting the investigation. Outside legal counsel in turn retained a forensic accounting firm to provide technical accounting guidance and analysis, as well as to assist with inventory review (outside legal counsel and the forensic accounting firm, collectively, the "Advisors").

The investigation, which remains ongoing, focuses on certain unrecorded financing arrangements and irregularities identified in sales, cost of sales, inventory, and accounts receivable recorded by Lugano. The investigation is limited to Lugano and the Audit Committee presently has no reason to believe the investigation affects or will involve any of the Company's other operating segments. There have been no limitations imposed on the investigation's scope or timing, or the Advisors' access to information or personnel.

On May 7, 2025, after considering the advice and recommendations of the Company's management and the Advisors, and discussion with the Company's independent registered accounting firm, Grant Thornton LLP, the Audit Committee concluded that the Company's consolidated financial statements and other financial information for the fiscal year ended December 31, 2024 should no longer be relied upon due to the materiality of the preliminary findings of the investigation described above. Any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated financial statements and other related financial information covering the fiscal year ended December 31, 2024 should also no longer be relied upon. The Company is in the process of evaluating the impact of these matters on internal control over financial reporting and expects to report one or more additional material weaknesses in internal control over financial reporting.

95.    The May 7, 2025 Form 8-K further stated:

Resignation of Lugano Chief Executive Officer

In connection with the ongoing investigation, on May 7, 2025, Mordechai Haim "Moti" Ferder, resigned from his position as Chief

Executive Officer of Lugano, and from all offices and directorships previously held with Lugano and its subsidiaries and affiliates. Mr. Ferder's resignation constitutes a voluntary termination of his employment for which he will not receive any severance or additional compensation. Together with his resignation, Mr. Ferder waived certain contractual rights, including his right to serve as a director of Lugano and its affiliates and subsidiaries.

96.     Finally, the May 7, 2025 Form 8-K stated, "In connection with the ongoing investigation and non-reliance on financial statements disclosed in Item 4.02, on May 7, 2025 the Board of Directors elected to postpone the annual meeting of stockholders previously scheduled for May 29, 2025 until a later date."

97.     On June 25, 2025, the Company filed a Form 8-K with the SEC which expanded the time period in which the Company had to restate its financials. The Form 8-K stated, in relevant part:

As the Investigation has progressed, the Advisors observed and confirmed to the Audit Committee that the identified irregularities also existed during fiscal years 2022 and 2023. Accordingly, on June 18, 2025 the Audit Committee, after consultation with the Company's management, the Advisors, and Grant Thornton, concluded that, in addition to the previously issued financial statements for fiscal year 2024 contained in the Company's Annual Report for December 31, 2024, the previously issued financial statements and other interim and full-year financial information for the fiscal years ended December 31, 2022 and December 31, 2023 should also no longer be relied upon, and that any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated financial statements and other related financial information covering the fiscal years ended December 31, 2022 and December 31, 2023 should also no longer be relied upon. The Company is continuing to evaluate the impact of these matters on internal control over financial reporting for the fiscal years ending December 31, 2022, 2023, and 2024, and expects to report one or more material weaknesses in internal control over financial reporting.

## **DAMAGES TO COMPASS**

98.   As a result of the Individual Defendants' wrongful conduct, Compass disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Compass's credibility. Compass has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

99.   Indeed, Compass has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Actions. Compass has further incurred costs and expenses with regard to the restatement of its financials.

100.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Compass's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

101.   Moreover, these actions have irreparably damaged Compass's corporate image and goodwill. For at least the foreseeable future, Compass will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Compass's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## **DEMAND AND DERIVATIVE ALLEGATIONS**

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

104.   Plaintiff is an owner of Compass common stock and was an owner of Compass common stock at all times relevant hereto.

105.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

106.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Compass Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

107.   At the time this action was commenced, the Board consisted of eight directors: Defendants Sabo, Edwards, Bottiglieri,[1] Enterline, Bhathal, Mahon, Simon, and Shaffer (collectively, the "Director Defendants"). The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**Demand is Futile as to the Director Defendants**
**Because they Each Face a Substantial Likelihood of Liability**

108.   The Director Defendants all face a substantial likelihood of liability for their actions in issuing the false and misleading 2023 Proxy and 2024 Proxy, which resulted in their reappointment to the Board despite their breaches of fiduciary duty.

109.   The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and earnings calls on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

---

[1]   Defendant Bottiglieri intended to not stand for re-election at the 2025 Annual Meeting, which was scheduled for May 29, 2025, but because the 2025 Annual Meeting was postponed, as described herein, Defendant Bottiglieri still serves as a director of Compass.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110.   Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

111.   The Director Defendants' conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Compass to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

**Defendant Sabo Lacks Independence**

112.   Defendant Sabo is not disinterested for purposes of demand futility because his principal occupation is CEO of Compass. Accordingly, his livelihood is dependent on and completely intertwined with the other Director Defendants.

113.   In addition, Sabo is a founding partner of CGM, which is named as a defendant. CGM receives management fees from Compass which Sabo receives as a

managing member of CGM. Sabo therefore cannot impartially consider a demand against CGM nor Compass.

114.   Lastly, Sabo is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

**Demand Is Excused as to Defendants Bottiglieri,**
**Edwards, Shaffer, and Simon Because as Members of the**
**Audit Committee They Face a Substantial Likelihood of Liability**

115.   Defendants Bottiglieri, Edwards, Shaffer, and Simon, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false and misleading financial statements. More specifically, as members of the Audit Committee, Defendants Bottiglieri, Edwards, Shaffer, and Simon were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Bottiglieri, Edwards, Shaffer, and Simon, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as required by the Audit Committee Charter and as demonstrated by the fact that the Company is restating its financials. For this reason, demand is futile as to Defendants Bottiglieri, Edwards, Shaffer, and Simon.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary duty

116.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Compass's business and affairs.

118.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

119.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Compass.

120.   In breach of their fiduciary duties owed to Compass, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) Compass's internal control over financial reporting was defective; (ii) Lugano had violated applicable accounting rules and acceptable industry practices with respect to its financing, accounting, and inventory practices during the Company's 2022, 2023, and 2024 fiscal years; (iii) Lugano's 2022, 2023, and 2024 financial results had been artificially distorted by these irregularities; (iv) Compass had failed to implement effective internal controls over the Company's financial reporting; and (v) as a result, Compass's reported 2022, 2023, and 2024 financial results did not reflect the actual financial results of the Company and such reported results were materially misstated.

121.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, as demonstrated by the fact that the Company is restating its financials.

122.   The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

123.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Compass has sustained significant damages. As

a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

124.   Plaintiff, on behalf of Compass, has no adequate remedy at law.

### COUNT II
**Against the Director Defendants for**
**Violations of Section 14(a) of the Exchange Act**

125.   Plaintiff incorporates by reference and realleges each and every allegation setforth above, as though fully set forth herein.

126.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

127.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

128.   The Director Defendants caused the 2023 Proxy and 2024 Proxy to be issued which failed to disclose, *inter alia*, that contrary to the 2023 Proxy and 2024 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, including overseeing the auditor, the Board and its committees were not adequately exercising these functions, were causing or

1   permitting the Company to issue false and misleading statements, and thus the

2   Individual Defendants on the Board were breaching their fiduciary duties.

3       129.   The 2023 Proxy and 2024 Proxy were also false and misleading

4   because they failed to disclose that: (i) Compass's internal control over financial

5   reporting was defective; (ii) Lugano had violated applicable accounting rules and

6   acceptable industry practices with respect to its financing, accounting, and inventory

7   practices during the Company's 2022, 2023, and 2024 fiscal years; (iii) Lugano's

8   2022, 2023, and 2024 financial results had been artificially distorted by these

9   irregularities; (iv) Compass had failed to implement effective internal controls over

10  the Company's financial reporting; and (v) as a result, Compass's reported 2022,

11  2023, and 2024 financial results did not reflect the actual financial results of the

12  Company and such reported results were materially misstated.

13      130.   In the exercise of reasonable care, the Director Defendants should have

14  known that by misrepresenting or failing to disclose the foregoing material facts, the

15  statements contained in the 2023 Proxy and 2024 Proxy were materially false and

16  misleading. The misrepresentations and omissions were material to Company

17  shareholders in voting on the matters set forth for shareholder determination in the

18  2023 Proxy and 2024 Proxy, including but not limited to, the reelection of the

19  Director Defendants as members of the Board and the reappointment of Grant

20  Thornton as the Company's auditor.

21      131.   The Company was damaged as a result of the Director Defendants'

22  material misrepresentations and omissions in the 2023 Proxy and 2024 Proxy.

23      132.   Plaintiff, on behalf of Compass, has no adequate remedy at law.

24                          **PRAYER FOR RELIEF**

25      FOR THESE REASONS, Plaintiff demands judgment in the Company's

26  favor against all the Individual Defendants as follows:

27      A.      Declaring that Plaintiff may maintain this action on behalf of Compass,

28

1    and that Plaintiff is an adequate representative of the Company;

2          B.      Awarding the amount of damages sustained by the Company as a result

3    of the Individual Defendants' breaches of fiduciary duties and other violations of

4    law;

5          C.      Directing all the Individual Defendants to account for all damages

6    caused by them and all profits and special benefits and unjust enrichment they have

7    obtained as a result of their unlawful conduct, including all salaries, bonuses, fees,

8    stock awards, and options;

9          D.      Granting appropriate equitable relief to remedy the Individual

10    Defendants' breaches of fiduciary duties and other violations of law;

11          E.      Awarding to Plaintiff the costs and disbursements of the action,

12    including reasonable attorneys' fees, accountants' and experts' fees, and costs and

13    expenses; and

14          F.      Granting such other and further relief as the Court deems just and

15    proper.

16                          **JURY TRIAL DEMANDED**

17          Plaintiff hereby demands a trial by jury.

18     Dated: September 5, 2025              Respectfully Submitted,

19

20                                          **BRAGAR EAGEL & SQUIRE, P.C.**
                                            /s/ *Melissa A. Fortunato*
21                                          Melissa A. Fortunato (SBN 319767)
                                            Marion C. Passmore (SBN 228474)
22                                          515 South Flower Street, Suite 1800
                                            Los Angeles, CA 90071
23                                          Telephone: (213) 612-7735
                                            Facsimile: (212) 214-0506
24                                          Email:  fortunato@bespc.com
25                                                     passmore@bespc.com
26
27                                          *Counsel for Plaintiff*

28

1

## VERIFICATION

2

3  I, Mark Begich, declare that I have reviewed the Verified Stockholder Derivative Complaint

4  ("Complaint") prepared on behalf of Compass Diversified Holdings, and authorize its filing. I have

5  reviewed the allegations made in the Complaint, and as to those allegations of which I have personal

6  knowledge, I believe those allegations to be true. As to those allegations of which I do not have

7  personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them

8  to be true. I further declare that I am a current holder of Compass Diversified Holdings stock and

9  have continuously held Compass Diversified Holdings stock from the time of the wrongdoing

10  alleged herein until the present. I declare under penalty of perjury that the foregoing is true and
correct.

11  Executed this *19* day of August 2025.

12

13

14  Mark Begich

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT